10]       JANUARY TERM, 1904.              273

Chicago, St. P., M. & O. R. Co. v. Douglas Co. 122 Wis. 273.

CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COM-
PANY, Appellant, vs. DOUGLAS COUNTY, Respondent.

*May 10—June 10, 1904.*

*Taxation: Exemption: Property "necessarily" used in operating rail-
road: Elevators: Principal use: Temporary interruption.*

1. Under subd. 14, sec. 1038, Stats. 1898, exempting from general
   taxation property "necessarily used in operating any railroad,"
   the word "necessarily" means neither that such use is "inevit-
   able" nor that it is merely "convenient" or "profitable," but
   refers to some stage of utility or materiality to the general
   business of a common carrier less than the former but greater
   than the latter of those expressions.

2. Exclusive devotion of such property—such as a hotel or elevator
   —to persons or freight carried by the railroad is not essential
   to such exemption, but principal devotion thereto will suffice.

3. A railway company could not perform the duty of transporting
   to its natural market the coarse grain grown along its line,
   without an elevator on Lake Superior whose operations should
   be under its control. It could not induce or expect the con-
   struction of such facilities by others. It therefore built an
   elevator solely as a means of effectively performing its duty as
   a carrier, and without any purpose of conducting a storage
   business or of engaging in the elevator business for direct
   profit. It rented the building to a firm engaged in buying and
   marketing grain, who operated it under an agreement to re-
   ceive therein promptly at all times all grain from the company's
   cars, and to care for, hold, and deliver the same at actual cost,
   without periodic storage charges. The lessees also, to some
   extent, received and stored grain of other persons for hire, but
   the bulk of the grain handled was their own. *Held*, that the
   elevator was "necessarily used in operating the railroad," and
   was exempt from general taxation, under subd. 14, sec. 1038,
   Stats. 1898.

4. The facts that during two certain years, owing largely to short-
   age in the coarse grain crops, very little grain was brought
   by the railway company to the elevator, and that the lessees
   thereupon bought grain elsewhere, bringing it in over other
   roads and placing it in the elevator, did not deprive the elevator
   of its character as property necessarily used in operating the
   railroad, so as to render it subject to taxation in those years.
   WINSLOW, J., dissents, being of the opinion that the elevator
   was taxable during those years, its principal use during that

time being for the accommodation of the public generally and not for the discharge of the railway company's duties as a carrier.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Reversed.*

Plaintiff, a Wisconsin railroad corporation, owning a line of road extending from Duluth and Superior southwestward through Minnesota, Iowa, South Dakota, and Nebraska, found that tributary to its lines in the West were raised very large quantities of the coarser grains, a large share of which sought the Eastern markets. In attempting to compete for the carrying of this grain to navigable water, it found at Superior and Duluth, constituting the principal point for that purpose, serious obstacles in delivering such grain to boats for water carriage. It appeared that while at this port there were numerous elevators equipped with appliances for taking grain from cars into bins, so that it might be delivered again into boats, these elevators were owned either by competing railroads or by those who were operating them in what is known as the "elevator business," consisting largely in the separating, mixing, and grading, and especially in the storage for a monthly charge; that the expense of reaching most of these elevators over the switch tracks of other roads was considerable; that their charges for receiving and delivering the grain, including twenty days of storage, were half a cent a bushel, and that for each additional thirty days they charged an additional half cent per bushel; that the delivery of grain to such elevators not controlled by plaintiff involved an unnecessary delay of its cars, amounting on the average to about twenty-four hours each car each trip, which, owing to the necessity of rapid handling of grain in the marketing season, was a very great burden on plaintiff's conduct of such business; that the season at which grain was marketed was such that long intervals of delay intervened between its arrival at navigable water and the time when

navigation opened in the spring, so that the burden of monthly storage charges made it impossible to bring these coarse grains by way of plaintiff's road; that the bringing eastward of grain was a business complementary to that of hauling coal and other commodities westward, so that the cars might go loaded both ways, otherwise the expense to plaintiff, and consequently to residents of the regions served by it, was seriously destructive of values; that it made strenuous exertion to induce the establishment of receiving and shipping facilities upon its line under conditions and terms to obviate these burdens, but could induce no one to undertake it. Accordingly, in 1899, it constructed an elevator of about 1,300,000 bushels capacity upon Allouez Bay in Superior, to which it laid a track. It rented this building to a firm engaged in the business of buying grain in the West and marketing it in the East, who undertook to operate the elevator and keep it in condition and to receive into that elevator promptly all grain over plaintiff's road from any station thereon, and to elevate and deliver such grain promptly and at a charge of actual cost—which in practical operation has been found to be one quarter of one cent per bushel for receiving and delivering, inclusive of the intervening storage—"so that the transportation of grain on the railway of [plaintiff] may be aided and facilitated by the use of said elevator." Such lessees also agreed to pay $5,000 per year rent, which promise, however, was by mutual consent canceled after the first year, the lessees finding they could not afford to pay any rent for the elevator, operated as agreed. The rental during the first year was accounted for by plaintiff as part of the gross profits of its railroad business and tax thereon paid. The elevator has been thus operated since; the lessees themselves, however, buying in the graingrowing regions the great bulk of the grain which has been received therein. During the years 1901 and 1902 there were failures of crops in many sections, including those

traversed by plaintiff's road, and the Western demand for coarse grains was such as to practically prevent shipments from such regions to Eastern markets, whereby it occurred that during those years very little grain arrived over plaintiff's road. The lessees, however, took into the elevator their own grain, which they had bought in other localities and shipped to Duluth and Superior over other roads, the same being switched from such other roads to the elevator by the plaintiff. During all the time the lessees have been in the market for grain of others for storage, like other elevators, at the same rates, but the court finds that the great bulk of the grain received and handled in the elevator was their own. It is also found that plaintiff's chief purpose in building such elevator was to increase shipments of coarse grains over its road, to enable it to compete for such shipments, to handle its cars more rapidly and economically, and generally to reduce the cost of its transportation business to and from Superior.

This action was brought to set aside the taxes levied by the authorities at the city of Superior for general taxes for the year 1902. A similar action—No. 131 on this calendar—was commenced with reference to the taxes for 1901, tried, decided, and appealed herewith. The court held, as conclusion of law, that the elevator was not necessarily used in operating the plaintiff''s railroad, within the meaning of subd. 14, sec. 1038, Stats. 1898; hence that it was properly taxable, and entered judgment dismissing the complaint, from which the plaintiff appeals.

For the appellant there was a brief by *S. L. Perrin,* attorney, and *Thomas Wilson,* of counsel, and oral argument by *Mr. Wilson.*

For the respondent there was a brief by *C. H. Crownhart,* attorney, and *Thos. E. Lyons,* of counsel, and oral argument by *Mr. Crownhart.*

Dodge, J.   The question of the exact limits in practical application of our statutory scheme of taxing each of our railroads as a whole, heretofore by an impost measured by the gross earnings, and reciprocally exempting the various specific pieces of real and personal property which together and in connection with its franchise constitute the railroad, has been often considered, but, we are constrained to confess, with imperfect success in prescribing either principles · or rules which have been found workable as later cases have arisen.   Each such case, while paying apparent deference to the ultimate decisions in preceding ones, has expressed dissent from some of the principles upon which its predecessors were decided.   The question is one of statutory construction, upon which decisions ·from other courts having different statutes or different general rules for construction of somewhat similar statutes can be of little use, if they may not be positively misleading.

The exemption (subd. 14, sec. 1038, Stats. 1898) is limited to property "necessarily used in operating any railroad."   This is entitled to liberal construction in favor of the plaintiff, because it is nòt a mere exemption from taxation, but is part of the general scheme of taxing all of this class of property otherwise than other property.   *Merrill R. & L. Co. v. Merrill,* 119 Wis. 249, 96 N. W. 686, and cases there collected.   Nevertheless, it is not subject to such construction as to exempt property merely because it is owned by a railway corporation, but which is devoted to other distinct business than that of the company as a common carrier.   *Duluth, S. S. & A. R. Co. v. Douglas Co.* 103 Wis. 75, 79 N. W. 34.   Notwithstanding certain marked variations in our cases as to the reasons which warrant exemption, we may consider the attitude of this court as pretty well settled upon certain propositions.   Among these is the view that "necessary" in this statute means neither "inevitable" nor merely

"convenient" or "profitable," but some stage of utility or materiality to the general business of a common carrier less than the first but greater than the latter of these expressions. Further, it is decided that a hotel or a grain elevator may, under some circumstances, so serve the purposes of a railroad as to be necessary within this statute. *Chicago, M. & St. P. R. Co. v. Crawford Co.* 48 Wis. 666, 5 N. W. 3; *Chicago, M. & St. P. R. Co. v. Bayfield Co.* 87 Wis. 188, 58 N. W. 245. Also that exclusive devotion to persons or freight carried by the railroad is not essential, but that principal devotion thereto will suffice. *Milwaukee & St. P. R. Co. v. Milwaukee,* 34 Wis. 271; *Chicago, M. & St. P. R. Co. v. Crawford Co.* 48 Wis. 666, 5 N. W. 3.

In attempting to ascertain from these decided cases why a hotel or elevator in one instance should be held taxable and in another exempt, we are somewhat embarrassed by the necessity of recognizing that each of the earlier cases enforcing taxability of such structures is in some measure, at least, overruled by the later ones holding them exempt, and by the resulting uncertainty as to the extent to which the earlier cases are still authority. The reason given in *Milwaukee & St. P. R. Co. v. Crawford Co.* 29 Wis. 116, for taxability of the hotel was that its use was not confined *exclusively* to patrons of the railroad, and presumably merely the antithesis was the conception expressed as "going into a general hotel business," which was declared to be unnecessary, especially in Prairie du Chien, where hotel accommodations were abundant. Now, in the later case, 48 Wis. 666, 5 N. W. 3, this *sine qua non* of exclusive use was repudiated, and mere principal use for patrons of the road was held sufficient to support the necessity of running a general and public hotel, even at Prairie du Chien, with all its hotel accommodations. The latter case certainly also establishes that the existence of abundant hotel accommodations at the same city is not conclusive against the necessity

of owning a hotel of its own by a railroad for convenience
of its patrons, provided such be its principal use, although
at the same time it be open to the general public and to that
extent in competition with others.   Exemption of the hotel
in that case was deemed supported by other such considera-
tions as that the railway company did not anticipate or re-
ceive any direct profits from the hotel business, nor, indeed,
from the hotel building, which it leased without rental to an
individual merely to secure its maintenance—a circumstance
completely duplicated in the case at bar.   Again, in deciding
an elevator taxable in *Milwaukee & St. P. R. Co. v. Mil-
waukee, supra,* it cannot be doubted that the court placed its
decision on the ground that operating an elevator was a dis-
tinct and private business; that no railroad could be com-
pelled to conduct it, and as a result it could in no case be
necessary to the operation of a railway; therefore could not
support condemnation proceedings.   The court put hotels on
exactly the same legal ground.   Such view as to hotels was
overruled in the second Prairie du Chien case (48 Wis. 666,
5 N. W. 3), and as to elevators in *Chicago, M. & St. P. R.
Co. v. Bayfield Co., supra,* where it was held that an elevator
was necessary and was exempt.   In the latter case the
authority of the ultimate decision in the Milwaukee case was
saved by saying that upon the same facts the court would
probably reach the same result, but the principle that an ele-
vator could never be necessary in the statutory sense to a rail-
road business was, of course, repudiated.   Indeed, that
view, on mature reflection, would be very difficult to sustain
consistently with the very decision of the court in the Mil-
waukee case itself as to the freight warehouses.   The ele-
vator primarily is essentially a building equipped with im-
proved apparatus for receiving grain in bulk off the cars of
the railroad and placing it in such position as to be conveni-
ently delivered to him who is to receive it from the railway
company, whether in wagons to haul to his mill or into boats

to continue its transport to the consumer. It is merely a perfected freighthouse specially provided for grain in bulk. Such specialized appliances become necessary when the volume of any commodity becomes great. Where the amount of grain to be transported is small, it is handled either by bagging it and moving the bags by hand, or by means of shovel and basket; but could the railways from the grain fields by such methods properly perform their duty to the thousand and more millions of bushels of grain which each season must pass from grower to consumer? All kinds of commodities, when their transshipment becomes frequent and regular enough, justify and require special structures and appliances. Cattle yards and pens for cattle; power cranes and derricks for stone or heavy machinery; baggage elevators, with either overhead or underground passageways, in the great passenger stations—all these and a multitude of other costly appliances illustrate the elasticity which lurks in the word "necessary" when applied to the means to be adopted for making possible the vast commerce of a country like this by those charged with the duty of transportation. A grain elevator *per se* serves as directly the simple purpose of transportation and delivery as does the well-equipped freight or passenger station. Doubtless many people not railroads own elevators and use them for storage and for grading and mixing grain to an extent almost of manufacture; but so also many people own warehouses and use them for storage for hire; but it was held in the Milwaukee case that a not dominant use of the freight warehouses for purpose of general storage for hire was not inconsistent with their recognition as proper and necessary structures for railroad purposes. In the Milwaukee case the court seems to have overlooked the dual function of an elevator building, and dealt with it solely as a place for storage and mixing of grains, a general business quite distinct from transportation, instead

of an appliance for receipt and delivery, a field clearly within the province of the carrier,

Since the Milwaukee case is the only one directly holding a grain elevator not exempt, it becomes necessary to consider the differences between the facts in that case and the present one, as also the materiality of those differences as legal distinctions under the principles laid down in that and other cases. In that case it appeared that the elevators, or most of them, were built by the firm of Angus Smith & Co., engaged in separate business as elevator men; that much of the profits of that business resulted from the mere storage of grain at fixed monthly rates, while the owner thereof held it for sale or use, as distinguished from the other important function of unloading grain from cars and passing it through the elevator into boats, and that the railway company shared in these profits. Further, there was no showing that any substantial obstruction to the railway company's business of delivering grain need result from use of any other elevators in the city, nor that any needs of the company induced the building of those under consideration. In the instant case the proof is undisputed that the elevator in question was constructed by the company solely as a means to the effective performance of plaintiff's duty as a carrier to deliver grain hauled by it, and without any purpose of conducting a storage business or of realizing any direct profit from the operation of the elevator in competition with those in the separate elevator business. It was shown that, in order to take in grain along its road and deliver it, as most of it must be, to boats, the existing elevator arrangements at Superior and Duluth constituted a practically insuperable obstacle. Those arrangements subjected the grain to such burden of expense, and plaintiff's cars to such delays, that the grain could not be brought at all from the regions of Iowa and Nebraska where its road reached. True, it is found by the trial court that

the existing elevators were adequate to handle all the grain plaintiff ever tendered them and all that was ever tendered to it for transportation, but this statement is partial and almost evasive. It ignores the fact fully shown that, so long as it must bear the burden of the expense above mentioned, little or no grain was or ever would be tendered to this company in the region it traversed, but that such grain would by such burden be so reduced in price to the producer as to warrant its consumption at home or transport to some other market. Another notable difference between these cases is that in the Milwaukee case it appeared that individuals in the separate elevator business with private capital were ready to, and in fact did, construct the elevators in question, while here it affirmatively appears that diligent efforts to secure such result were made without effect, and that there was no probability that private enterprise and capital would have supplied the needed facilities. Such fact is dwelt on with much force in the Bayfield case as marking its distinction from the Milwaukee case.

We deem it fully established that the plaintiff could not perform the duty of transporting the grain grown along its line to the natural market without an elevator at Duluth or Superior of which operation should be under its control; that it could not induce or expect the construction of such facilities by others; that it did construct the elevator in question wholly for that purpose, and without prospect or expectation of engaging in the elevator business for direct profit. From these facts we can reach no conclusion other than that its construction and ownership were necessary to the railroad business of carrying and delivering grain. Indeed, that situation existing, such necessity seems established by the Bayfield case, 87 Wis. 188, 58 N. W. 245. Though that be true, there nevertheless remains the question whether this elevator has been in fact used for railroad purposes. *Duluth, S. S. & A. R. Co. v. Douglas Co.* 103 Wis. 75, 79

N. W. 34. That is, Has its use been principally as a facility to the delivery of grain brought by plaintiff, or principally as a general public elevator, competing with others for grain on storage for hire? The question is somewhat confused by the fact that the persons whom the plaintiff put in possession to run it were themselves among the largest of buyers and shippers in the grain regions traversed by the railroad, so that it happened that the great bulk of grain plaintiff would at any time receive for transport and delivery, or they would receive or hold in the elevator, would be their own. This, however, cannot be material, for, if the volume of delivery to a single customer be of sufficient magnitude, proper appliances for delivery to him alone may be quite as essential to performance of the carrier's duty as if the delivery were to many persons. So we may eliminate that circumstance, except as it bears on certain others to be noted later. This elevator has been turned over to the lessees, to do with substantially as they pleased, subject to their agreement at all times to receive grain from plaintiff's cars with preferential dispatch over all others, thereby, of course, largely excluding them from general competition in open markets for elevator business; also under agreement to care for and hold such grain without periodic storage charges. This provision we deem highly significant of the purpose that as to grain from plaintiff's patrons the elevator shall serve distinctively the essential railroad function of unloading and delivery, and shall exclude that of storage for hire, dominant in general elevator business. Of course, we know that the bulk of the grain crop moves in the late autumn and winter; also that navigation of Lake Superior is suspended till April or May; hence a railroad with terminus on that lake cannot complete its delivery to water transportation till months after grain is brought to such terminus. Those engaged in elevator business do not discriminate between grain merely awaiting earliest opportunity to continue its transportation

and that held by owners awaiting a satisfactory price or convenience of their mills to grind, but charge storage on all at a half cent per month. Thus the arrangement that all plaintiff's grain should be treated as awaiting complete delivery, and not as on storage, was very significant. Its patrons were assured the same expense in getting grain from shipment to delivery on boats at the same cost whether plaintiff could deliver at once or only after some months of delay. This operation of the elevator so secured by contract seems to us distinctively a railroad use. We cannot consider this use seriously affected by the fact that the lessees were willing to and did receive grain of other persons for storage for hire, for the proportion of that kind of business done, while not accurately ascertained either by finding or evidence, was obviously not the principal use of the elevator. Necessarily, as suggested, their duty of preference to the plaintiff's patrons must have excluded any extensive engagement of the elevator for such purpose, and the court has found that the bulk of the grain handled in this elevator was that belonging to the lessees themselves; hence, by implication certainly, excluding the idea that any very large proportion of it was thus received from others for storage.

The only remaining circumstance which bears upon whether the principal use of this elevator was other than as a railway appliance is that in the two years under consideration an unusual condition existed, so that the coarse grain in the region traversed by plaintiff's road was quite limited in amount, and by reason of failure of crops in the interior of the country even such surplus as did exist did not, to much extent, come eastward for a market, so that there was very little grain brought by the plaintiff to Superior, whether belonging to the lessees of the elevator or any one else. In this situation the lessees of the elevator, being in the business of buying grain at its place of growth and disposing of it in the

Eastern markets, bought where they could and their grain was brought to Duluth and Superior. Having the elevator thus unoccupied by grain coming over the plaintiff's road, they placed in it their own grain, which had come in over other roads, the plaintiff receiving therefrom only the revenue resulting from moving the cars over its own switch tracks from the railroads which had brought them from the West. We cannot think that this destroys the conclusion otherwise reached that the principal purpose and use of this elevator has been to enable plaintiff to perform its duty as a carrier. It is a condition which may never arise again, and is due to causes over which, of course, plaintiff had no control. It cannot be that, when a railroad constructs permanent appliances necessary to the conduct of its ordinary business, those appliances cease to be railroad property and become taxable simply because, owing to temporary conditions, the need to use the same is temporarily interrupted. This elevator is, of course, a permanent structure, intended, as we have shown, to meet the exigencies and needs of this railroad company as an almost perpetual servant of the public needs for transportation and commerce. While it is kept and maintained as such we think it remains railroad property, and necessarily used for railroad purposes, within the meaning of the statute, although during certain intervals of time the railroad may obtain none of that particular form of business which originally demanded its construction, and which may reasonably be expected generally to demand its maintenance.

As a result of our considerations, we have reached the conclusion that the structure in question, operated as it is, falls within the reasons set forth as to a similar structure in *Chicago, M. & St. P. R. Co. v. Bayfield Co.* 87 Wis. 188, 58 N. W. 245, and that the circumstances temporarily affecting the years 1901 and 1902 are not sufficient to deprive it of that character; hence that during those years it was part of the general property of the railroad, necessarily used for its busi-

ness, and exempt from ordinary local taxation by virtue of subd. 14, sec. 1038, *supra*.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in accordance with the prayer of the complaint.

WINSLOW, J. I dissent in this case because I think the evidence shows that the elevator in question was not *necessarily* used in operating the appellant's road during the years in question, within the meaning of the statute. The facts are undisputed that during the years 1901 and 1902 this elevator was used as a public elevator, and that sixty per cent. of the grain handled therein came to it over other roads, and was handled for other parties. Its principal use, therefore, was for the accommodation of the public generally, and not for the discharge of the appellant's duties as a common carrier. Under these circumstances I think the previous decisions of this court call for affirmance of the judgment.